# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-1211

RICHARD HAYNES,

*Plaintiff-Appellant,*

v.

JO ANNE B. BARNHART, COMMISSIONER
OF SOCIAL SECURITY,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03-C-454—**John C. Shabaz**, *Judge.*

———————

ARGUED JANUARY 20, 2005—DECIDED JULY 26, 2005

———————

Before FLAUM, *Chief Judge*, and BAUER and KANNE,
*Circuit Judges.*

KANNE, *Circuit Judge.* Richard Haynes applied for social
security disability benefits and supplemental security in-
come. Following a hearing in 2001, an administrative law
judge ("ALJ") found that Haynes was disabled from June 1,
1998, until June 1, 1999, but not thereafter, because
Haynes was capable of performing a significant number of
light-level jobs. The appeals council denied Haynes's

request for review, and the district court affirmed the decision. On appeal, Haynes argues that the Medical Vocational Guidelines mandate a finding of disability outside the limited period determined by the ALJ. Haynes also argues that the ALJ improperly disregarded medical testimony that he claims mandated a finding of disability. We affirm.

## I.  Background

Richard Haynes was 53 years old at the time of his hearing before the ALJ. Haynes has a college degree in mathematics and science and has even earned some graduate school credits. Although Haynes served in the Air Force for about three years, the bulk of Haynes's work experience is in the field of carpentry. Since September 1995, Haynes has earned no more than $6000 doing carpentry on a part-time basis.

### A.  Haynes's Medical History

Since at least December 1996, when he smoked a pack and a half of cigarettes each day, Haynes has suffered from chronic obstructive pulmonary disease. In March 1997, Haynes underwent pulmonary function testing, which indicated that he suffered from severe airway obstruction—a perhaps unsurprising result, given that Haynes by then had increased his cigarette consumption to about two packs a day. At any rate, Haynes received bronchodilator treatment for his condition, and this course of treatment was apparently successful. Despite his ongoing smoking habit, Haynes exhibited only "scattered wheezes" with good air exchange by December 1998. The record does not disclose further medical treatment for any pulmonary problems since then, despite the fact that Haynes continued to smoke more than a pack a day through January 2001.

This was not the end of Haynes's medical problems, however. On June 1, 1998, while working a construction job, Haynes suffered a fractured right heel—a "comminuted displaced right calcaneus fracture," in medical jargon. Haynes underwent surgical debridement, reduction, and splinting for this injury. After surgery, Haynes undertook a regimen of whirlpool and wound debridement treatment, to which he responded well. Medical treatment notes from several months after the injury indicated that Haynes's surgical site was healing extremely well, although Haynes indicated that he still suffered some "discomfort" when attempting to move about on his fractured heel.

In September 1998, x-rays indicated that Haynes's fracture was showing improvement, but there was significant soft tissue swelling of the affected area. On the advice of Dr. Daniel Lochmann, Haynes's treating orthopedic surgeon, Haynes underwent physical therapy. Haynes experienced some success with this therapy, which apparently reduced pain and brought great improvements to Haynes's range of motion and strength. In November 1998, however, Haynes reported continued difficulty with the range of motion of his right ankle. Dr. Lochmann instructed Haynes to stay the course with his physical therapy and to remain off work until June 1999, the one-year anniversary of his injury.

In January 1999, Haynes reported significant difficulty standing longer than 15 to 20 minutes at a time. In addition, Haynes reported some weakness and pain in his foot and had difficulty bearing weight on it. Dr. Lochmann examined Haynes and discovered that his right ankle had a limited range of motion. Dr. Lochmann expressed doubt that Haynes could return to his previous work and activity level, although Haynes indicated that several prescription drugs helped to reduce the severity of the pain to a more moderate and bearable level. Haynes sought no further medical followup or treatment for his heel pain after January 1999.

In a March 1999 report, Dr. Lochmann recorded that Haynes was unable to stand or walk longer than 30 minutes at a time, nor could he walk for more than three hours in an eight-hour workday. The surgeon also noted, however, that Haynes could perform work in which he occasionally lifted 20 pounds or frequently lifted 10 pounds. In addition, Dr. Lochmann determined that Haynes could do work that involved unrestricted sitting, occasional climbing and balancing, and no exposure to heights.

Over a year later, in September 2000, Dr. Nina Gilberg conducted a consultative examination of Haynes's heel and reported that the calcaneus fracture had healed for the most part. Haynes's right foot remained tender and swollen, but Haynes showed some range of motion and could bear his full weight on the foot, although he had a slight limp. Haynes could also rise from a chair and could get on and off an examination table without difficulty.

Dr. Gilberg concluded that Haynes could not perform any work requiring significant standing, walking, or carrying. Nevertheless, she concluded that Haynes could perform tasks while seated, if permitted to adjust his position while doing so. Dr. Gilberg also opined that Haynes could perform work requiring occasional lifting and carrying of between 10 and 20 pounds. In addition, Dr. Gilberg believed that Haynes could stand and walk a total of three to four hours a workday (for five to ten minutes at a time) and could sit for most of the workday with position changes every 20 to 30 minutes. She specified, however, that any such work should require no use of ladders, balancing, stooping, or crouching. Moreover, Haynes's work should entail no more than occasional kneeling or crawling, limited pushing and pulling, limited work at heights, and limited exposure to moving machinery (if balance is involved), temperature extremes, or vibration.

Unfortunately, Haynes's medical problems were not confined to the physical ailments described above. As docu-

mented in the record, Haynes also has a long history of chronic alcohol abuse. He has been arrested repeatedly for driving while intoxicated, and has been fired or otherwise disciplined for problems arising from his alcohol dependence. Haynes has been committed to detoxification programs on multiple occasions. Although he has benefitted from periods of remission, Haynes has engaged in repeated episodes of binge drinking on and off through late 2000. Over the years, Haynes was prescribed various medications for his alcohol dependency, but he only took these medications erratically.

Haynes has also been diagnosed with a mild form of depression and bipolar disorder. He received ongoing therapy and took Prozac and other prescription drugs for these disorders. As of December 1998, Haynes's depression was in marked remission, and his bipolar disorder was in full remission as of October 1999.

### B. Hearing and Decision

The above-described maladies gave rise to a series of applications, beginning in 1995, that Haynes filed seeking social security disability benefits and supplemental security income. Most of these applications and resulting administrative appeals were denied in full, and their disposition is not relevant to this case. The appeal before us relates specifically to a partially favorable decision issued by an ALJ on March 29, 2001.

The hearing that preceded the ALJ's decision took place in January 2001. At this hearing, Haynes testified that he still suffered pain in his heel and wore athletic shoes rather than the prescribed orthopedic boots. Haynes also testified about his bipolar disorder and depression, and the medication and therapy he received. He stated that he still smoked (about a pack and a half per day) and suffered from obstructive pulmonary disease, for which he took inhalant medica-

tions. Haynes indicated his belief that his physical and mental ailments precluded him from working a full day.

Regarding his limitations, Haynes stated that he could lift or carry up to 10 pounds, and could lift (but not carry) up to 20 pounds. Haynes also indicated that he could walk three to four hours a day, with breaks after five to ten minutes. He claimed that in a work setting, he needed breaks every 15 minutes.

Haynes testified that he lived with his girlfriend. His daily activities entailed helping out around the house—washing dishes, dusting, and making his bed, for example. Haynes maintained his driver's license and drove on occasion. In addition, he continued to do small carpentry jobs and even participated in a vocational rehabilitation program that would enable him to run a small woodworking business for 20 hours a week.

In addition to Haynes's testimony concerning the range of his physical activities, the record included several documents in which Haynes provided additional detail regarding his daily activities. For example, Haynes filed a disability report with the Social Security Administration in January 1996. In that report, Haynes indicated that he had been fired six times in the previous three years due to his chronic alcohol abuse. He also indicated that, at the time, he carried out a number of daily activities, including washing dishes, cooking, cleaning, shopping for groceries, driving, doing laundry, and visiting with family members. In addition, Haynes fished (sometimes twice a day), hunted, and frequented casinos.

Similarly, in January 1998, Haynes filed a completed questionnaire with the Wisconsin Department of Health & Family Services, in which he indicated that he cleaned the house, washed dishes, drove daily, checked on his mother at her home, took walks, shopped for groceries, cooked his own meals, did laundry, performed some yard work and home

maintenance tasks, attended sporting events and church activities, and volunteered at a nonprofit organization five hours each week.

The ALJ also heard other pertinent testimony and opinions at the hearing. Dr. Robert Mulhausen, a board-certified physician in internal medicine, testified at the hearing after reviewing the record and listening to Haynes testify. Dr. Mulhausen identified a number of impairments Haynes suffered: the healed fracture and post surgery complications, history of ethanol dependency in remission with occasional relapse, depression, bipolar disorder, post-traumatic stress disorder, tobacco abuse, and chronic obstructive pulmonary disease.

Dr. Mulhausen testified that Haynes did not have any impairment or combination thereof that met or was the medical equivalent of any listed impairment. Dr. Mulhausen offered no opinion regarding Haynes's limitations prior to June 1, 1998. He opined, however, that Haynes was able to perform at a level less than the sedentary exertional level for the year after he injured his heel— from June 1, 1998, to June 1, 1999. But Dr. Mulhausen concluded that, after June 1, 1999, Haynes could perform tasks that entailed: standing or walking for three to four hours a day, for five to ten minutes at a time; lifting up to 20 pounds occasionally and 10 pounds frequently; sitting with the ability to change position every 20 to 30 minutes and with reasonable arm and hand use; no climbing of ramps, ropes, or scaffolds; no balancing; and no exposure to humidity, fumes, or temperature extremes. In addition, Dr. Mulhausen stated that Haynes should avoid work that required balancing, hazards, machinery, or heights. Finally, Dr. Mulhausen opined that Haynes would miss no more than three days of work per month due to his heel pain and pulmonary problems.

Edward Utities, a vocational expert, also testified after having reviewed the record. The ALJ asked Utities a hypo-

thetical question whether jobs existed that a person of Haynes's age range (47 to 53), education, and vocational background could perform if he could: lift 20 pounds occasionally and 10 pounds frequently; stand and walk three to four hours in a workday for only five to ten minutes at a time; and sit for most of the workday if permitted to change position every 20 to 30 minutes. The ALJ's hypothetical further assumed that such an individual could: perform work in the unskilled to lower semi-skilled range; only occasionally kneel, crawl, push, or pull; not use ladders, balance, stoop, or crouch; and not be exposed to humidity, dust, fumes, unprotected heights, dangerous moving machinery (if balance is involved), temperature extremes, or vibrations.

Taking into account these various limitations, Utities opined that such a hypothetical person could, in the regional economy, perform light-level assembly jobs (of which there were about 5000 statewide) or light-level packing jobs (6200 statewide).

Based on the record and evidence adduced at the hearing, the ALJ undertook the required five-step analysis, *see* 20 C.F.R. §§ 404.1520, 416.920, and rendered a partially favorable decision on March 29, 2001. The ALJ found that Haynes had not been engaged in substantial gainful activity since September 1, 1995 (step one). He also found that Haynes suffered from severe medical impairment (step two)—namely, chronic obstructive pulmonary disease; a comminuted displaced right calcaneus fracture with multiple fragmentation; and depressive, bipolar, and substance addiction disorders. The ALJ concluded, however, that those impairments did not meet or equal the level of severity required by the listings (step three). 20 C.F.R. Pt. 404, Subpt. P, App. 1. Accordingly, the ALJ found that

> from June 1, 1998, to June 1, 1999, [Haynes] would have had the residual functional capacity [RFC] for less than full time sedentary level work on a sustained basis, due

to his right calcaneal fracture, and necessary recuperation period. However, the undersigned finds that [Haynes] otherwise had the [RFC] at least for work requiring lifting 20 pounds occasionally and 10 pounds frequently, standing/walking 3 to 4 hours in an 8 hour work day, and 5 to 10 minutes at a time, sitting up to 8 hours in an 8 hour work day, and 20 to 30 minutes at a time, no climbing, balancing, stooping, or crawling, only occasional kneeling or crouching, limited pushing or pulling, no work around unprotected heights or dangerous moving machinery, no work around temperature or humidity extremes, dust, or fumes, and no more than unskilled or lower semi-skilled level work. The undersigned finds no substantial support in the record as a whole for further reduction in this [RFC].

The ALJ then considered whether Haynes could return to any of his past relevant work as a carpenter. The ALJ found that at all times relevant to the adjudication, Haynes had a history of semi-skilled work with no work skills transferable to his RFC, so Haynes was unable to return to that work (step four). Based on Utities's testimony, the ALJ found that Haynes could perform a significant number of light-level jobs then existing in the national economy— including bench assembler and wrapper/packager—corresponding to Haynes's RFC, age, education, and work experience (step five).

In sum, the ALJ determined that Haynes was disabled from June 1, 1998, to June 1, 1999, because he could not perform even sedentary work during that period. Outside that period, however, Haynes was capable of performing more than the full range of sedentary work, but less than a full range of light work, due to standing and walking restrictions. The appeals council denied Haynes's request for review of this determination, so the ALJ's decision became the final decision of the Commissioner of Social

Security. Haynes then sought judicial review in the district court, which affirmed the Commissioner's decision.

## II.  Discussion

When the appeals council denies review, we review the ALJ's decision as the Administration's final decision. *Eads v. Sec'y of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir. 1993). We review the ALJ's legal conclusions *de novo*. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005) (citation omitted). We deferentially review the ALJ's factual determinations, however, and will affirm a decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) ("Substantial evidence . . . [is] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotation marks omitted). We review the record as a whole, but we are not to reweigh the evidence or substitute our own judgment for that of the ALJ. *See Jens*, 347 F.3d at 212; *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). The ALJ need not, however, provide a "complete written evaluation of every piece of testimony and evidence." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).

Haynes alleges two errors on the ALJ's part. First, Haynes argues that, based on the ALJ's RFC determination, the Medical Vocational Guidelines ("the grids") required a finding of disabled for the period after June 1, 1999. Second, Haynes claims that the ALJ erred by ignoring testimony from Dr. Mulhausen and substituting his own "layman's" opinion. We take these arguments in turn.

*A.  The Grids*

As noted, the ALJ found that for the period outside June 1, 1998, to June 1, 1999, Haynes had an RFC subject to various limitations. Specifically, the ALJ determined that Haynes could stand and walk less than what is required of the full range of light work,[1] but could lift more than the weight required of sedentary work.[2] The ALJ also determined that Haynes was subject to various nonexertional restrictions that limited climbing, balancing, stooping, or crawling. Accordingly, the ALJ concluded that Haynes could perform a significant number of light-level assembly or packing jobs available in the local economy, consistent with the vocational expert's testimony.

Haynes does not challenge the ALJ's assessment of his RFC. Instead, Haynes complains that the ALJ did not, based on that RFC, find that he was restricted to sedentary work outside his one-year closed period of disability. Haynes further asserts that the ALJ was required to apply the so-called grids, a series of tables broken into separate rules "which classif[y] a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a) ("Where the findings of fact made with respect

---

[1]  "Light work" is defined as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job may also be considered light work if it requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" with intermittent sitting. Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5-6.

[2]  "Sedentary work" is defined as involving lifting no more than 10 pounds at a time and occasionally carrying articles such as docket files, ledgers, and small tools. SSR 83-10, 1983 WL 31251, at *5. In addition, walking and standing are required only occasionally (no more than two hours in an eight-hour workday). *Id.*

to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled.").

In this, Haynes seems to take an all-or-nothing approach to the grids and the different exertional levels—a claimant either is or is not capable of the *full* range of work within a particular exertional level. Haynes argues that, because he cannot perform the full range of light work, he necessarily "falls squarely" within the sedentary classification, for which he can perform the full range of work. In the grids table corresponding to the sedentary range of work, Haynes's age, education, and vocational factors line up to a decision of "disabled." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.14. According to Haynes, the ALJ should have applied the grids in this fashion and committed reversible error by not doing so.

We disagree. The regulations do not mandate the use of the grids in all circumstances in which a claimant happens to be capable of performing a full range of work at a given minimal level. Rather, the regulations broadly specify that the grids are to be employed and a conclusion directed regarding disability when a claimant's "vocational factors and [RFC] coincide with *all of the criteria* of a particular rule[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a) (emphasis added). In such circumstances, an ALJ need only line up the claimant's RFC and vocational factors in the appropriate grid table, and the grid will direct a finding of disabled or not disabled. But when a claimant does not precisely match the criteria set forth in the grids, the grids are not mandated. SSR 83-10, 1983 WL 31251, at *1 ("Where one or more of the criteria of a rule are not met, no decision is directed . . . .").

This is the precise situation we are presented with here. Haynes's RFC falls somewhere between the light and sedentary exertional levels, and thus he does not match all

of the criteria of the rules set forth in the grids. Appendix 2, which contains and discusses the grids, expressly posits just such a case:

> [A]n individual's ability to engage in substantial gainful work where his or her residual functional capacity *falls between the ranges of work indicated in the rules* (e.g., the individual who can perform more than light but less than medium work) is decided on the basis of the principles and definitions in the regulations, giving consideration to the rules for specific case situations in this Appendix 2.

20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(d) (emphasis added). Thus, Appendix 2 clearly envisions cases like Haynes's, in which the claimant has a "hybrid" RFC, and does not mandate the use of the grids in such cases. Indeed, if Haynes's interpretation were correct, the quoted language would make no sense, and Appendix 2 would simply direct the ALJ (as Haynes would have it) to shoehorn the claimant into the minimum full range of work that the claimant can perform and apply the appropriate rule in the grids. Instead, the grids and relevant policy statements speak in terms of *maximum* sustained work capability, so it would flout the purpose of the grids to stop short at the minimum full range of work that a claimant can perform and make a disability determination on that basis.

The regulations and relevant caselaw amply provide for situations in which claimants fall between exertional levels, as Haynes does here. In such cases, the ALJ must give consideration to the grids or use them as a framework. *See* SSR 83-10, 1983 WL 31251, at *1. In addition, consultation with a vocational expert may be helpful or even required. *See* SSR 83-12, 1983 WL 31253, at *2; *see also Books v. Chater*, 91 F.3d 972, 980-81 (7th Cir. 1996) (where the claimant could perform the full range of light work tasks subject to certain sitting and standing restrictions, it was

appropriate for the ALJ to procure testimony from a vocational expert and find the claimant not disabled).

Haynes's RFC not only does not precisely coincide with a particular full range of work, it also reflects impairments resulting in both exertional and nonexertional limitations. The grids, however, are designed for cases in which claimants are restricted entirely or mostly from exertional or strength limitations. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e); *see also Fast*, 397 F.3d at 471. Such limitations are those that affect a claimant's "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing and pulling)[.]" 20 C.F.R. § 404.1569a(b). Nonexertional limitations, on the other hand, relate to such restrictions as climbing, balancing, stooping, kneeling, crouching, or work environment, among others. 20 C.F.R. § 404.1569a(c).

When determining Haynes's RFC, the ALJ noted a number of physical limitations regarding lifting and standing restrictions. He also found a sizable number of nonexertional limitations, such as climbing, balancing, crawling, kneeling, and exposure to heights, moving machinery, temperature extremes, humidity, fumes, and dust. Therefore, Haynes's RFC indicated a combination of impairments resulting in both exertional and nonexertional restrictions. Appendix 2 and the relevant policy statements specify that in such cases, the ALJ must first determine whether the claimant may be found disabled based solely on strength limitations alone. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)(2). As noted, this was not the case with Haynes, as his RFC fell between the sedentary and light ranges of work, and therefore did not exactly coincide with Rule 201.14 of the grids, contrary to Haynes's assertion.

Appendix 2 requires that in such situations the ALJ use the grids as a "framework" but otherwise must reach a conclusion based on the factors and principles set forth in the regulations. *Id.* (noting that in cases "which cannot wholly

be determined under the rules in . . . Appendix 2, full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations"); *see also* SSR 83-14, 1983 WL 31254, at *3. Again, the corresponding policy statement recommends consultation with vocational resources to evaluate cases in which a claimant has a combination of exertional and nonexertional limitations. SSR 83-14, 1983 WL 31254, at *4; *cf. Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) (recognizing that "in cases where there is a nonexertional impairment [in addition to exertional impairment] the ALJ must go beyond the grid"). The policy statement also specifies that if a vocational expert is consulted and the claimant found not disabled, the ALJ's determination must include "(1) citations of examples of occupations/jobs the person can do functionally and vocationally and (2) a statement of the incidence of such work in the region in which the individual resides . . . ." SSR 83-14, 1983 WL 31254, at *6.

In light of these regulations, policy statements, and our caselaw interpreting same, we reject Haynes's argument that the ALJ was required to apply the grids. The grids were not mandated—Haynes's RFC did not coincide with the full range of either sedentary or light work, and he suffered from a combination of exertional and nonexertional limitations. *See Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993) ("[The grids] are only to be applied when they accurately describe a claimant's abilities and limitations."). The regulations and abundant caselaw clearly indicate that in such situations it is appropriate to consult with a vocational expert, which is precisely what the ALJ did. *See Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) ("[T]his court has said that in cases where a non-exertional limitation might substantially reduce a range of work an individual can perform, the ALJ must consult a vocational expert.") (citing *Warmoth v. Bowen*, 798 F.2d 1109, 1110 (7th

Cir. 1986)); *Lee*, 988 F.2d at 793; *accord Moore v. Apfel*, 216
F.3d 864, 869 (9th Cir. 2000) ("When the grids do not
completely describe the claimant's abilities and limitations,
such as when the claimant has both exertional and
nonexertional limitations . . . , the grids are inapplicable
and the ALJ must take the testimony of a [vocational
expert].").

The ALJ appropriately posed a hypothetical question to
Utities, the vocational expert who testified at Haynes's
hearing. As required, the ALJ's hypothetical question in-
corporated Haynes's limitations as reflected at length in the
record. *See Ehrhart v. Sec'y of Health & Human Servs.*, 969
F.2d 534, 540 (7th Cir. 1992). Utities rendered an opinion
based on relevant evidence and the factors included in the
hypothetical question, which reflected Haynes's age,
education, vocational factors, and RFC. On this basis, the
ALJ concluded that Haynes could perform work in a signi-
ficant number of jobs in the regional economy, including
bench assembler and wrapper/packager.

In reaching his decision, the ALJ provided detailed fac-
tual findings consistent with the requirements set forth in
the regulations and applicable policy statements. The ALJ
also acted in accord with "the common-sense rule that
where the grids do not address a particular problem, the
ALJ is entitled to rely on the . . . testimony of a [vocational
expert]." *Fast*, 397 F.3d at 472. In sum, the ALJ committed
no reversible error with regard to the grids.

### B.  Dr. Mulhausen's Testimony

Haynes next argues that the ALJ improperly disregarded
Dr. Mulhausen's testimony that Haynes would be required
to miss up to three workdays per month due to his pulmo-
nary condition and heel pain. This testimony is important
to Haynes, because the vocational expert testified that if a
claimant must miss more than two workdays a month, the

claimant would be unemployable. Haynes claims there was no evidence in the record to contradict Dr. Mulhausen's conclusion, and therefore the ALJ could not cast aside the physician's opinion and substitute his own "layman's" opinion.

Again we must disagree with Haynes. While it is true that the regulations require an ALJ to consider opinions offered by medical experts, an ALJ is not bound by those opinions and must evaluate them in the context of the expert's medical specialty and expertise, supporting evidence in the record, and other explanations regarding the opinion. *See* 20 C.F.R. §§ 404.1527(f)(2); 416.927(f)(2). Likewise, the relevant policy statement reinforces the requirement that the ALJ consider the supportability of the opinion, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the state agency medical or psychological consultant or other program physician or psychologist. SSR 96-6p, 1996 WL 374180, at *2.

In this case, the ALJ concluded that there was no medical evidence in the record to support Dr. Mulhausen's opinion that Haynes would need to miss up to three days per month. Moreover, there was no evidence that Haynes sought any additional medical treatment either for his pulmonary problems or his heel pain in the two years since January 1999. As the ALJ found, this fact was inconsistent with the notion that Haynes may have continued to suffer from serious medical problems. Furthermore, although most of Dr. Mulhausen's opinion regarding Haynes's limitations closely tracked other evidence in the record, no evidence supported his conclusion regarding the three workdays off, nor did he provide any elaboration or explanation for this conclusion.

In contrast, ample medical evidence in the record supports the ALJ's conclusion that, after June 1, 1999, Haynes

did not require up to three workdays off each month due to his physical impairments. For example, Dr. Gilberg's September 2000 consultative examination indicated that Haynes's heel had exhibited great progress in healing, and Haynes could bear full weight on his limb and walk with only a slight limp. The examination also indicated that Haynes could sit and stand from a chair and could climb on and off an examination table without difficulty. Dr. Gilberg concluded that Haynes would require no time off from work due to his heel.

Likewise, with respect to Haynes's pulmonary problems, the record reflects that as of December 1998, Haynes's condition had improved to no more than occasional scattered wheezes with good air exchange. For treatment, physicians only monitored Haynes's inhalant medications and recommended that he undergo various conventional methods of quitting smoking (e.g., nicotine patch). No treating physician recommended that Haynes take days off from work for treatment or rest.

The ALJ also extensively cited other factors in the record in support of his finding of not disabled. In particular, the ALJ found Haynes's own testimony regarding his physical condition inconsistent with the record as a whole. For example, Haynes on several recent occasions reported a level of daily activity that was fairly active and that the ALJ found inconsistent with complete disability. As detailed above, the record discloses that Haynes was capable of performing certain activities before and after his one-year period of disability, including hunting, fishing, gardening, shopping, yard- and housework, volunteering, and work related to starting up a woodworking business. In addition, Dr. Gilberg and Dr. Lochmann, doctors who examined or treated Haynes, both provided detailed analysis of Haynes's physical condition and capabilities. Their views are well supported in the record and coincide almost precisely with the ALJ's eventual determination of Haynes's RFC, which Haynes does not challenge.

Dr. Mulhausen was not one of Haynes's treating physicians, and the ALJ was entitled to reject Dr. Mulhausen's opinion in favor of other physicians' opinions and evidence in the record—particularly when Dr. Mulhausen's conclusion regarding the three-workday restriction was itself unsupported by any explanation or evidence. *See* 20 C.F.R. § 404.1527(d)(1) (noting that, generally, more weight is given to examining physicians over nonexamining ones); *see also Diaz*, 55 F.3d at 306 n.2 ("[I]f conflicting medical evidence is present, the [ALJ] has the responsibility of resolving the conflict."); *Luna*, 22 F.3d at 690 (concluding that ALJ appropriately discounted conflicting medical report when it lacked minimal detail and was "cursory in the extreme").

In view of all of these factors, the ALJ did not commit error when he chose not to adopt the portion of Dr. Mulhausen's opinion regarding Haynes's need to miss up to three workdays each month. Moreover, in reaching his decision, the ALJ exhaustively cataloged all of the relevant medical and other evidence, which weighs against Dr. Mulhausen's unsupported opinion. *Cf. Books*, 91 F.3d at 979-80. In sum, we conclude that ample evidence in the record supports the ALJ's determination that Haynes would not be required to miss up to three workdays a month, and substantial evidence supports the ALJ's finding of not disabled.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court, which upheld the ALJ's determination that Haynes was not disabled outside the closed period of June 1, 1998, to June 1, 1999.

No. 04-1211

**A true Copy:**

    **Teste:**

               _____
               *Clerk of the United States Court of*
                  *Appeals for the Seventh Circuit*