**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued June 14, 2006
Decided July 7, 2006

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 05-3796

| | |
|---|---|
| WILLIE LOVELACE, III,<br>    *Plaintiff-Appellant,*<br><br>      *v.*<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security,<br>    *Defendant-Appellee.* | Appeal from the United States<br>District Court for the Eastern<br>District of Wisconsin<br><br>No. 04-C-1164<br><br>J.P. Stadtmueller,<br>*Judge.* |

**ORDER**

Willie Lovelace applied for Supplemental Security Income and Disability Insurance Benefits, claiming that he was disabled since March 2001 because of severe obesity and various other conditions including sleep apnea, hypertension, a heart condition, edema, hip pain, osteoarthritis, and drowsiness. His claim was denied initially, upon reconsideration, and after a hearing before an Administrative Law Judge ("ALJ"). The ALJ determined that, although Lovelace's capacity was greatly reduced due to his obesity and other impairments, he was capable of performing sedentary work and thus did not qualify for disability benefits. Because the ALJ's decision is supported by substantial evidence, we affirm.

**I.**

At the time of his administrative hearing in 2003, Lovelace was 37 years old and weighed 450 pounds. He has a high school education, and has worked as a cook, security guard, handicapped van driver, and dietary aide. For three-and-a-half years preceding the onset of his alleged disability, he was an assembly worker, which required him to stand all day and lift up to 50 pounds. Lovelace weighed around 400 pounds while he performed this job. He was laid off in March 2001. Shortly thereafter, he applied for Supplemental Security Income and Disability benefits.

Lovelace submitted medical reports concerning the following conditions. The most prevalent condition in his medical files is his severe obesity. Lovelace is consistently characterized as "morbidly obese" in medical records from Martin Luther King Heritage Health Center ("MLK Center") and Sinai Samaritan Medical Center ("Sinai") from 1999 through 2002. Doctors encouraged him to lose weight, and in 2002, Dr. Hussamaddin Al-Khadour—an MLK Center physician who began treating Lovelace in 2001—reported that he lost about 17 pounds. Lovelace testified that for several years he has weighed over 400 pounds; by the time he left high school he already weighed around 270 pounds. He said he tried to exercise by walking on a treadmill or around the gym.

In addition to his morbid obesity, medical records dating back to 1999 from MLK Center and Sinai also state that Lovelace has sleep apnea. He underwent a sleep study at Sinai in 2000 and was diagnosed with "Obstructive Sleep Apnea (severe)" causing breathing difficulties and drowsiness. By 2000 MLK Center medical reports record that Lovelace was using a CPAP breathing machine, which was helping to reduce his wheezing and coughing. By 2002 Dr. Al-Khadour stated in his notes that Lovelace was using his CPAP three to four nights a week and "feels good" when using it. Lovelace denied any daytime somnolence when examined in 2002. Lovelace also testified that he felt less tired and sluggish when he used the CPAP.

A diagnosis of hypertension is also noted in Lovelace's medical records, but by 2000 doctors' notes recorded "very good blood pressure control." In 2001 Dr. Al-Khadour noted that Lovelace's hypertension was "controlled" with the drug Atacand. An entry from Dr. Al-Khadour's notes from 2002 stated that "blood pressure has been under good control" for the last three visits. At the hearing, Lovelace testified that his blood pressure was controlled with Atacand, and that he has no current heart problems.

In 1999 Lovelace came to the emergency room at Sinai with "bilateral lower extremity edema." In 1999 MLK Center physician notes state that he had "significant edema in . . . both legs" and doctors' notes from 1999 record level "3+ to 4+" edema. Doctor's notes state that the edema was secondary to sleep apnea. Medical records from 1999 also reflect that Lovelace was taking the diuretic Lasix; Lovelace testified that the Lasix made him drowsy. Doctor's notes from 2000 and 2001 record "+1 to 2" level edema.

Lovelace also suffered from hip pain and osteoarthritis. In 2000 an MLK Center physician noted that Lovelace said he was experiencing "increased hip pain"; the pain "seems to be worse when he sits for long periods" and he felt "[s]tiff when he stands up or bends over." The physician diagnosed "bilateral hip arthritis" and "probable osteoarthritis." In 2002 Dr. Al-Khadour also stated in his notes that Lovelace was experiencing "right hip pain"; he prescribed Indocin which he later noted was "helping." Lovelace testified that hip pain and swelling from the waist down limited his ability to sit or stand for extended periods. He said he could sit for only about an hour before he had to stand up, and he could stand only for about "15 to 20 minutes" before he needed to elevate his legs. He testified that he took the pain reliever Indomethacin for his hip, but said it made him drowsy and he needed to sleep for several hours after taking it.

Dr. Al-Khadour—Lovelace's treating physician since June 2001—completed three disability assessments diagnosing Lovelace with obesity, hypertension, and obstructive sleep apnea. In October 2001 he filled out a form labeled "presumptive disability determination," checking "no" to the question asking whether Lovelace would be seriously impaired and unable to work or return to normal functioning for at least twelve months. Three months later, on a "medical assessment form," Dr. Al-Khadour also checked boxes indicating that Lovelace had chronic fatigue and experienced drowsiness/sedation as a side effect of medication. Dr. Al-Khadour further checked boxes indicating that Lovelace could stand for less than two hours and sit for about two hours, and noted that he would have to take unscheduled rest breaks every thirty minutes if he were standing and every two hours if he were sitting, and that the breaks would have to last between fifteen and thirty minutes. Dr. Al-Khadour filled out a third "medical opinion" form in 2003 that was generally consistent with his 2001 assessment. However, this time Dr. Al-Khadour did not state that drowsiness was a side effect of Lovelace's medication. The doctor also noted that Lovelace's conditions would require him to be absent from work more than three times a month.

At the request of the Social Security Administration, Dr. Daniel Jankins, an internist, examined Lovelace in 2002. He diagnosed morbid obesity, hypertension that was "reasonably well-controlled," and sleep apnea. He noted that Lovelace had lower extremity edema and some decreased breath sounds in the bases of his lungs.

Dr. Jankins also noted that Lovelace "denies any significant daytime somnolence" and "claims he can be up on his feet for maybe a couple of hours at a time and also can sit for several hours at a time." Dr. Jankins concluded, "I would suspect he would be able to work [sic] but at a job that required very low physical endurance."

The ALJ denied Lovelace benefits. He found Lovelace's complaints of pain and limitation "not as severe or limiting as claimant has alleged." The ALJ further found that Lovelace had severe obesity and other impairments which greatly restricted his ability to work, but that he maintained the residual functional capacity (RFC) to perform a full range of sedentary work provided that he could change positions every 45 minutes and did not have to stand more than two hours in an eight-hour workday. A vocational expert (VE) testified that such an individual could perform a significant number of jobs in the national economy, including assembler, inspector, or security monitor, and on this basis the ALJ denied Lovelace benefits. The Appeals Council declined review, and the ALJ's decision became the final decision of the Commissioner of Social Security. The district court affirmed the decision.

## II.

We will uphold the ALJ's decision if it is supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and adequately discusses the issues. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).

Lovelace's major argument is that the ALJ failed to consider his obesity alone or in combination with his other impairments—heart condition, sleep apnea, hip pain and osteoarthritis, edema, and drowsiness. *See* S.S.R. 02-1p. He argues that the ALJ's observation that "obviously the obesity is severe" but it has not "result[ed] in any compromise of claimant's other body systems" is conclusory and unsupported. He also argues that the ALJ erred by suggesting that Lovelace's obesity was self-inflicted when he remarked, "[t]here is no evidence to suggest that claimant has done much to address that [obesity] problem, weight remaining quite high," citing *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004). In *Barrett,* we found that the ALJ was wrong when he suggested that obesity is a self-inflicted disability, thus implying that "conditions caused or aggravated by obesity were irrelevant." *Id.* at 1068.

Obesity itself is a condition, not a disability. *See Gentle v. Barnhart,* 430 F.3d 865, 868 (7th Cir. 2006). It can be the cause of a disability, and it can aggravate a disability caused by something else. *Id.* If, as in the present case, there are underlying impairments, then an ALJ should consider the claimant's obesity for its

"incremental effect" on the disability. *Id.*; *see also Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000). However, an ALJ's failure to explicitly consider a claimant's obesity is subject to a harmless-error analysis. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (per curiam).

Here the ALJ specifically considered Lovelace's obesity in determining that Lovelace was capable only of performing sedentary work as long as he could shift positions every 45 minutes. The ALJ specified, for example, that Lovelace's "tolerance for prolonged standing and walking would be significantly compromised because of his obesity." The ALJ went on to note that Lovelace "would be limited in terms of more exertional activities in conjunction with the obesity and obstructive sleep apnea." Although the ALJ did not individually consider the effects of Lovelace's obesity on each of his seven alleged impairments, Lovelace does not specify how his obesity in combination with any of his impairments affected his ability to work. *See id.* Moreover, the ALJ's ruling reflects that he adopted physicians' opinions which had noted Lovelace's obesity. *Id.*

Further, Lovelace's case is not like *Barrett*, where we rejected the ALJ's implication that obesity was not an aggravating condition. 355 F.3d at 1068. The problem in that case was that "we don't know what [the ALJ] thought." *Id.* The ALJ here, however, never found Lovelace's other ailments irrelevant, and indeed, he specifically acknowledged that Lovelace's obesity exacerbated his other problems.

Lovelace also argues that the ALJ erred in formulating his residual functional capacity (RFC) when he "concluded plaintiff could sit for 6 hours without explaining how he came to that conclusion and without any medical support." He argues that the only medical opinion concerning his ability to sit was Dr. Al-Khadour's, limiting him to two hours of sitting per day, and he argues that the ALJ erred by not according this opinion controlling weight because Al-Khadour was Lovelace's treating physician. This error, Lovelace suggests, was prejudicial because the VE determined that a person who could sit for just two hours a day was unemployable.

An ALJ must "give controlling weight to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (internal quotations omitted). When a treating physician's views do not meet this standard, however, the ALJ may discount the opinion because "a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Moreover, an ALJ must explain and support how he determined a plaintiff's limitations in formulating an RFC. *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Here the ALJ permissibly discounted Dr. Al-Khadour's two-hour sitting limitation, and adequately supported his finding that Lovelace could sit for six hours. In determining Lovelace's RFC, the ALJ first considered the limitations suggested by Dr. Al-Khadour, but found that "[w]hile claimant's physician has offered rather restrictive estimates as to residual functional capacity [ ], his contemporaneous progress notes are generally absent with regard to any significant abnormalities." Indeed, Dr. Al-Khadour's contemporaneous notes are devoid of any indication that Lovelace had sitting limitations, and do not explain how he arrived at the two-hour sitting limitation. When a treating physician's opinion is "inconsistent with his own progress notes" an ALJ is entitled to discount the opinion. *Skarbek,* 390 F.3d at 503.

The ALJ's finding that Lovelace could sit for six hours if he had the opportunity to change positions every 45 minutes, while not as strong as it might have been, was supported with record evidence. In making his determination, the ALJ relied on Dr. Jankins's report, which reflected Lovelace's comment to Dr. Jankins that he could "sit for *several* hours at a time" (emphasis added). This comment, taken together with the lack of detail supporting Dr. Al-Khadour's two-hour sitting limitation, is sufficient to support the ALJ's determination that Lovelace could sit for six hours if he had the ability to change positions every 45 minutes.

Lovelace additionally argues that the ALJ failed to make a credibility finding. *See* S.S.R. 96-7p. Specifically, Lovelace argues that the ALJ's credibility determination amounted to "a single, conclusory statement" and was not based on specific reasons supported by the record. He also argues that his subjective complaints of hip pain, edema, and drowsiness are supported by objective medical evidence.

An ALJ is in the best position to judge a witness's truthfulness, and we will overturn an ALJ's credibility determination only if it is patently wrong. *Schmidt v. Barnhart,* 395 F.3d 737, 746-47 (7th Cir. 2005). We will affirm an ALJ's credibility determination so long as the ALJ gives specific reasons for the finding that are supported by the record. *See Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003).

Here the ALJ made a finding that questioned Lovelace's subjective complaints of pain, stating that "[w]hile claimant may have some degree of pain and limitation, it is not as severe or limiting as claimant has alleged." His reasoning was not as strong as it might have been, but the ALJ supported his finding with citations to record evidence. He noted, for instance, that while Lovelace claimed that he needed to elevate his legs, "there is nothing in the record to suggest such restriction and, in fact, the Lasix which claimant has been prescribed has addressed

the edema, along with the C-PAP which has also reduced  [ ] the extent of the edema in the lower extremities." Indeed, Dr. Al-Khadour's 2001 assessment explicitly noted that Lovelace did not need to elevate his legs with prolonged sitting. The ALJ also stated, "[a]s to the hip complaints, there have never been any x-rays taken with regard to such, nor has there been much focus on those complaints in the progress notes either by claimant or any of the physicians examining him." Further, while Dr. Al-Khadour's progress notes show that Lovelace complained of hip pain in 2002, Lovelace reported during one follow-up visit that the prescribed Indocin was helping. The ALJ did not explicitly address Lovelace's allegations of drowsiness; however, he noted that Lovelace's sleep apnea, a cause of drowsiness, was controlled with the CPAP breathing machine. Lovelace confirmed during his testimony that he felt less sluggish if he used the CPAP, and doctors' notes consistently state the CPAP reduced Lovelace's sleep apnea symptoms.

Finally, Lovelace argues that the ALJ mischaracterized his hip pain, sleep apnea, and edema by minimizing the extent to which Lovelace suffered from these conditions. Specifically, Lovelace argues that the ALJ improperly discounted the extent of his hip pain because there were no hip x-rays or detailed doctors' progress notes regarding hip pain in the record, and erroneously determined that Lovelace's sleep apnea and edema were not disabling. Moreover, Lovelace argues that the ALJ entirely failed to analyze his heart condition, osteoarthritis, and drowsiness.

The record shows that the ALJ did not mischaracterize Lovelace's hip pain, sleep apnea, and edema. While there are some doctors' notes regarding hip pain, Dr. Al-Khadour noted in 2002 that medication was helping. And neither Dr. Al-Khadour nor Dr. Jankins mentioned hip pain in his medical assessment. While an ALJ cannot disbelieve a claimant's allegations of pain just because the allegations seem "in excess of" the objective medical evidence, an ALJ can disbelieve testimony that is exaggerated or inconsistent with pain allegations, or where there is evidence that a condition has responded to treatment. *See Johnson v. Barnhart*, No. 05-3797, 2006 WL 1520067, at *2-3 (7th Cir. June 5, 2006). Here Lovelace's hip pain medication was helping, and he testified that the only condition preventing him from working a sedentary job was his drowsiness.

The record also suggests that Lovelace's sleep apnea was under control—doctors' notes state that the CPAP reduced Lovelace's sleep apnea symptoms, and Lovelace confirmed this in his testimony. Finally, the record suggests that Lovelace's edema might not have been as severe as alleged because, although Lovelace claimed that he needed to elevate his legs, nothing in the record suggests this. Indeed, Dr. Al-Khadour specifically opined in one medical assessment that Lovelace did not need to elevate his legs.

   The ALJ also did not ignore Lovelace's heart condition, osteoarthritis, or drowsiness. The ALJ noted that Lovelace "denied any heart problems" at his hearing. And while the ALJ mentioned osteoarthritis only once in his decision, his lack of focus on Lovelace's osteoarthritis is consistent with the fact that the condition is barely mentioned in the record. Where osteoarthritis is mentioned, it is in relation to Lovelace's hip pain, which the ALJ adequately addressed. And the ALJ also discussed Lovelace's drowsiness, though in a general sense. The ALJ noted that medical records stated Lovelace was experiencing "fatigue," and that Lovelace testified to feeling less "sluggish" when he used the CPAP breathing machine. The ALJ also indirectly addressed Lovelace's drowsiness when he considered the related condition of sleep apnea. And even if the ALJ had mischaracterized or ignored any of Lovelace's impairments, Lovelace does not specify how these impairments exacerbated his ability to work, so a remand on this issue would not affect the outcome of the case. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination).

                                                                    AFFIRMED.