UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 3, 2006
Decided November 1, 2006

**Before**

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 06-1394

| | |
|---|---|
| ROBERT BURTON,<br>            *Plaintiff-Appellant*,<br><br>  v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security,<br>            *Defendant-Appellee*. | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division.<br><br>No. 04 C 1941<br><br>David F. Hamilton,<br>*Judge*. |

ORDER

Robert Burton applied for disability insurance benefits in April 2002, claiming that he was disabled due to diabetes polyneuropathy and anxiety. His claim was denied initially, upon reconsideration, and after a hearing before an ALJ. The ALJ found that, although Burton had severe impairments, they did not equal a listed impairment and he was capable of sedentary work. Because the ALJ's decision is supported by substantial evidence, we affirm the denial of benefits.

At the time of his hearing, Burton was 33 years old and had attended college for two years. Beginning in 1997 he worked as a loan officer for a cash advance company. He then worked full time as an aide for a home health care company until he could no longer perform the lifting required of that job. In February 2002 the company transferred him to the position of "scheduler" and reduced him to

part-time hours, but in April 2002 he voluntarily quit working because his back pain caused him to miss too much work.

Burton testified that he first experienced back pain that made it difficult for him to work in August 2001.  Burton suffers from a pars defect in his lower back that, he said, bothers him "the majority" of the time.  To alleviate the pain, he uses, in addition to other unspecified drugs, a duragesic patch and receives injections in his lower spine every two or three months.  He said that the injections sometimes help but that the patch makes him vomit and fall asleep.  He admitted, however, that the side effects from the medications are not as bad now as they once were.  In addition, when he has back pain, he said, he must lie on the floor for up to two or three hours.

Burton also testified that he has "emotional problems" that interfere with his ability to work.  In particular, Burton said that he has suffered for many years from anxiety, which causes him to become nervous around strangers and large crowds of people.  Paxil controlled the anxiety in the past.  Following an automobile accident in March 2003, however, he began experiencing increased emotional problems and sought psychiatric treatment.  First, he said that he sought treatment because he could no longer ride in a car.  He then said that he sought treatment because he began hearing "voices in his head" again.[1]  Approximately a week or two prior to the hearing, however, he started taking Trazodone to quiet the voices and said that it has "made it better to where [the voices are] less frequent."  But the combination of the Trazodone with his other medications caused him to respond slowly when someone talked to him.  When asked by the ALJ whether his problems dealing with people or being in crowds had anything to do with the voices, Burton responded with a third reason for seeking treatment: "I don't know.  I went to the psychiatrist because I have a problem that whenever I go into a crowd of people I freeze up."  He explained that he had been able to perform his job as a health aide despite the anxiety because he worked only with people he already knew but, for example, could not go shopping by himself.  And, although his supervisors reported that Burton performed his job well and left work only because of his back pain, Burton said that many times he missed work due to anxiety but never told his supervisors about his anxiety because he did not want them to think he was "crazy."

---

[1]He said he first heard voices 10 to 15 years ago.  At that time he was hospitalized and diagnosed with schizophrenia.  He received social security benefits for approximately six years, but after attending vocational training and responding favorably to medication he discontinued benefits and began working again.  He then stopped taking his medications because he was "doing better."

According to Burton, he is unable to work.  He testified that due to his back pain he cannot "project–like with a broken arm" and cannot predict his pain levels from day to day.  He also cannot sit for very long, has to lie down when his back hurts, and occasionally cannot get out of bed until the pain medications "kick in."  He explained that he has "a tendency to zone out" when he takes his medication and has had to hire a homemaker to do chores around his apartment 10 hours a month because:  "[S]ome days I can do some housecleaning, but other days no.  Some days I can't even get out of bed . . . . Because I have too many problems with my back and the medicine I'm on and the mental problems–I'll go haywire."  Moreover, he said that he cannot participate in vocational training because he thinks it unlikely that he could find "somewhere" that would understand his limitations.  But, he said, he will "try anything."

Burton's medical history reveals regular treatment for back pain.  From December 2001 to June 2003 Dennis F. Lawton, M.D. saw Burton for complaints of neck, leg, and back pain, and diagnosed Burton with diabetes, polyneuropathy, and severe back pain.  Although the majority of Burton's visits to Lawton were to adjust his medications in an attempt to manage his pain while minimizing the side effects, Lawton's notes reveal that Burton received relief from his pain with the duragesic patch and a TENS unit.  Nevertheless in May 2002, November 2002, and May 2003, Lawton declared Burton fully disabled and restricted him from performing any work.  In May 2003, however, Lawton noted "possible release from restriction in six months."  Burton then sought treatment for his back pain from Robert A. Lillo, M.D.  From April 2003 to January 2004, Lillo's notes reveal that he performed a physical examination of Burton and diagnosed minor disc protrusions and chronic low back pain.  He treated Burton with pars and epidural injections and recommended physical therapy.  The injections did not initially help alleviate Burton's pain, but by August 2003 Lillo observed that he had a "nice response" to the injections and noted:  "I do not think there is much to do here.  I think the main thing would be to have him increase his fitness and stop smoking."  In May 2003 Burton also sought treatment from Jeffrey A. Heavilon, M.D.  Heavilon observed that Burton could "move fairly easily from a seated to standing position," and that he was able to "walk on toes and heels without any weakness."  He diagnosed a pars defect at L5 and "nonradicular low back pain," noted that an operation was not likely to improve Burton's condition, and recommended that Burton "be as active as possible, control his weight, and discontinue smoking."

Burton's medical history also corroborates his testimony that he received regular treatment for generalized anxiety and panic disorder.  In December 2001 Burton first told Lawton that he had "always had some nerve problems" and explained that he became anxious when meeting new people.  Lawton diagnosed panic disorder and prescribed Paxil.  One month later Burton reported that the Paxil controlled his anxiety.  In February 2003, however, Burton reported that "his

nerves are shot." And in July 2003 he told Lawton that the Paxil no longer controlled his "nervousness."

Burton then sought treatment from Brairwood Clinic because he felt "extremely nervous and anxious in all areas of his life." Briarwood's intake notes reveal that Burton contacted the clinic in July 2003, reporting that he had been in an automobile accident in March 2003 and had since experienced nightmares and could no longer ride in a car. He also reported that he had "diminished interest in all activities, feelings of detachment from others, irritability, hyper-vigilant, strong physical sensations, difficulty concentrating, [and] feelings of distress about accident." After scheduling and cancelling appointments in August, September, and October, Burton met with Rebecca Licht, a mental health counselor, in December 2003 at which time he reported hearing voices, having suicidal thoughts, and being deeply depressed. Burton also told Licht that he had been diagnosed with schizophrenia and was afraid to go out in public. Licht met with Burton three times and in January 2004 referred him to Brian Bertsch, M.D., a psychiatrist. The record does not contain Bertsch's file or the results of any psychological testing he may have performed.

Three state agency physicians submitted written assessments of Burton in conjunction with his application for benefits. Ceola Berry, Ph.D., met with Burton in August 2002 and reported that he suffered from "mood disorder due to medical condition of diabetic neuropathy with generalized anxiety and panic features," as well as obesity, diabetic neuropathy, and hypertension. At the consultation, Burton complained of poor balance; pain in his arms, legs, and lower back; panic attacks; trouble staying asleep; and irritability. He denied delusions or hallucinations. Berry observed that Burton ambulated without aid, was calm, and exhibited "adequate concentration, judgment, insight and impulse control." In October 2002 R. Wanzler, M.D., completed a Physical Residual Functional Capacity Assessment and J. Pressner, Ph.D., completed a Psychiatric Review Technique. As to Burton's physical limitations, Wanzler opined that Burton could lift 10 to 20 pounds and could sit, stand or walk for a total of six hours a day. With respect to Burton's emotional limitations, Pressner opined that Burton suffered from affective and anxiety-related disorders but was not severely impaired.

In addition, at the February 2004 hearing a medical expert and a vocational expert testified at the ALJ's request. The medical expert, Dr. Richard Hutson, explained that Burton suffered from a pars defect with "mild slippage" of the vertebra and degenerative disk disease. He opined that he would limit Burton to sedentary work with a sit/stand option, no overhead reaching, and no repeated twisting or trunk vibration. Given the limitations recommended by the medical expert and Burton's transferable skills, Gail Ditmore, the vocational expert, testified that Burton could perform work as an assembler, inspector, or record clerk.

She opined, however, that if he was required to lie down for a couple hours each day, was absent more than two days a month, or could not concentrate for 15 minutes each hour, work would be impossible.

At the ALJ's request Burton supplemented the record following the hearing. He submitted a Mental Residual Functional Capacity Assessment completed by Dr. Bertsch, the psychiatrist he had consulted in January and February 2004. After meeting with Burton only two times, Bertsch reported that Burton suffered from schizoaffective disorder, generalized anxiety, a persistent depressed mood, dulled cognitive skills, poor concentration and memory, and disorganized thinking. He opined that, even though Burton has "fairly good insight and judgment and lives within his limitations," he would be absent from work more than three times a month and that "consistency would rarely be maintained on any mild or moderately stressful job." Bertsch noted, however, that no limitations existed on Burton's ability to perform "the activities of daily living." But Bertsch again did not provide his file or the results of any clinical testing he performed before arriving at his diagnosis.

Following the five sequential steps laid out in 20 C.F.R. § 404.1520(a)-(f), the ALJ found that (1) Burton had not performed substantial work since his alleged onset date of April 2002; (2) his physical impairments were severe; (3) his physical complaints did not meet or equal a listed impairment; (4) he could not perform his past relevant work but had transferable skills; and (5) there were jobs available to him because he could perform sedentary work. Of significance for this appeal, the ALJ refused to give Dr. Bertsch's March 2004 report controlling weight because although "the doctor does have a treating relationship with the claimant, the treatment history is quite brief, as he was only seen twice." The ALJ also found Burton's subjective complaints of pain "not entirely credible." The ALJ explained that evidence established that Burton engaged in activities, such as independently maintaining his appearance, housekeeping, and bowling, that "are not limited to the extent one would expect" of someone complaining of disabling pain and mental impairment. The ALJ also noted that Burton's "generally unpersuasive appearance and demeanor while testifying at the hearing" was a factor in his decision. The Appeals Council declined review, and the ALJ's decision became the final decision of the Commissioner of Social Security. The district court affirmed in a thorough, well-reasoned decision.

We will uphold the ALJ's decision if it is supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). An ALJ's findings are supported by substantial evidence if they identify supporting evidence in the record and adequately discuss the issues. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).

Burton first challenges the ALJ's decision to discount Dr. Bertsch's opinion, which if properly credited would compel a finding that Burton was unable to work because he opined that Burton would miss work more than three days a month. Burton argues that the ALJ erroneously discounted Bertsch's opinion because it was based upon only two meetings and was inconsistent with the opinions of the state's psychologists. Burton also contends that the ALJ failed to consider that his mental condition deteriorated between the time of the state's evaluations in August and October 2002 and Bertsch's March 2004 report.

An ALJ must "give controlling weight to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). When a treating physician's views do not meet this standard, however, the ALJ may discount the opinion because "a claimant is not entitled to disability benefits simply because [his] physician states that [he] is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

Here the ALJ permissibly discounted Dr. Bertsch's March 2004 opinion that Burton suffered from mental limitations that would cause him to miss work more than three days a month. Contrary to Burton's contentions, the ALJ did not discount Bertsch's March 2004 opinion merely because it was inconsistent with the state's reports. The ALJ also noted that "the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant." Indeed, even though the ALJ asked Burton to supplement his submissions after the administrative hearing, the record is devoid of any reports of clinical or laboratory testing Bertsch may have performed to support his conclusions concerning Burton's mental limitations. Bertsch's March 2004 opinion therefore appears to be based solely upon subjective complaints that Burton made to him. In addition, the ALJ was allowed to consider how often Bertsch treated Burton. *See* 20 C.F.R. § 404.1527(d); *Hofslien*, 439 F.3d at 377 (questioning the "meaning and utility" of the treating physician rule). And as the district court noted, the ALJ "generously" referred to Bertsch as Burton's "treating physician" because he had met with Burton on only two occasions. *See Hofslien*, 439 F.3d at 377 (explaining that the advantage a "treating physician has over other physicians . . . is that he has spent more time with the claimant").

Citing *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000), Burton contends that Bertsch's opinion—even if based on treatment for only a short time—reflected a deterioration of his mental condition that the ALJ was "required to consider" when evaluating Bertsch's opinion. *See Clifford*, 227 F.3d at 870-71 (stating in dictum that "[i]t does not appear from the record that the ALJ considered [the] possibility"

that claimant's condition may have worsened). In *Clifford* we instructed the ALJ to reevaluate whether the claimant's treating physician's opinion was entitled to controlling weight because, among other things, evidence in the record suggested that the claimant's condition had deteriorated since the state physicians had rendered their opinions. *Id.* at 871. The treating physician's disability finding, however, was based upon his examination of Clifford's x-rays and a physical examination. *Id.* at 867. In contrast, the record in Burton's case contains no evidence of clinical or diagnostic testing to support Bertsch's opinion that Burton's condition had deteriorated. Accordingly, on this record, the ALJ's decision not to grant Bertsch's March 2004 opinion controlling weight was proper. *See White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (upholding ALJ's decision to discount treating physician's residual functional capacity evaluation because it was not supported by objective medical evidence and was inconsistent with other evidence).

Burton also challenges the ALJ's finding that he was not "entirely credible," arguing that the ALJ failed to properly consider his testimony concerning daily activities, subjective complaints of pain, and the side effects of his medications. *See* S.S.R. 96-7. He insists that the ALJ should have accorded greater weight to his testimony that he must lie down during the day to relieve his back pain and must frequently take days off due to disabling pain, "mental condition," and doctor's appointments. And, he says, the ALJ failed to adequately discuss his reasons for rejecting his testimony. If his testimony concerning his limitations were properly credited, he says, he would be unable to work.

When assessing an individual's credibility, an ALJ must consider evidence in the record regarding the individual's daily activities as they relate to his symptoms and treatment regimen. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003); C.F.R. § 404.1529; S.S.R. 96-7p. The ALJ may not ignore subjective complaints of pain solely because they are unsupported by medical evidence, *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005), but may consider discrepancies between the objective medical evidence and the degree of pain complained of, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000). Because the ALJ is best positioned to judge a witness's truthfulness, we will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

The ALJ supported his credibility determination with a reasoned discussion of the record in light of these rules. The ALJ first explained that the discrepancy between Burton's assertions that he could not engage in substantial gainful activity and his ability to perform daily activities such as keeping his home clean and maintaining his personal hygiene called into question his allegations that he was unable to perform "substantial gainful activity." Although an ALJ may not rely solely on an individual's ability to engage in sporadic physical activities to

determine that the individual can work 8-hours a day, five days a week, *see Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004), the ALJ in this case noted that Burton had also routinely engaged in other activities outside his home. For example, the ALJ noted that Burton sustained an injury while bowling 18 months after he claimed to be totally disabled due to debilitating back pain and fear of being in public. Similarly, the ALJ noted that, contrary to Burton's contentions that his pain was severe and his medications provided little relief, the objective medical evidence showed that his mental and physical impairments were "slight" and that he had responded favorably to both his pain and psychiatric drugs. In addition, the ALJ was allowed to consider Burton's physical appearance and demeanor at the hearing as one factor in assessing Burton's credibility. *See Powers*, 207 F.3d at 436. Thus the ALJ's credibility determination complied with Social Security Regulation 96-7p.

AFFIRMED.