NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois  60604

Argued April 23, 2008
Decided May 13, 2008

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

JOHN L. COFFEY, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 07-2161

| | |
|---|---|
| JANE HERNANDEZ, <br> *Plaintiff-Appellant,* <br><br> *v.* <br><br> MICHAEL J. ASTRUE, Commissioner of <br> Social Security, <br> *Defendant-Appellee.* | Appeal from the United States District <br> Court for the Western District of <br> Wisconsin. <br><br> No. 06-C-0344-C <br><br> Barbara B. Crabb, <br> *Chief Judge.* |

**O R D E R**

Jane Hernandez applied for Disability Insurance Benefits and Supplemental Security Income payments in December 2001, claiming that asthma and chronic obstructive pulmonary disease ("COPD") limited her ability to work.  The Administrative Law Judge found that she was not disabled because she could still perform her past work as a produce sorter.  The district court accepted a magistrate judge's recommendation to affirm.  On appeal Hernandez raises several challenges to the ALJ's decision, but because substantial evidence supports that decision, we affirm the denial of benefits.

At the alleged onset date of her disability, July 2001, Hernandez was 43 years old. She had previously worked as a housekeeper and as an inspector, sorter, and packager with various plastics, cheese, and produce companies.

Throughout 2001 Hernandez was treated by Dr. Michael Netzel at the Monroe Clinic in Monroe, Wisconsin for her asthma, which she was controlling with a combination of bronchodilators, corticosteroids and leukotriene receptor antagonists. She consistently reported shortness of breath and chest tightness. In August 2001 (a month after the alleged onset of disability), Hernandez saw Dr. Netzel because her shortness of breath had increased. She denied any wheezing, and Dr. Netzel prescribed a tapering course of Prednisone. At the end of October Dr. Netzel completed a "Respiratory Report" for Hernandez. He noted a "slight trend downwards" in her asthma since 1998, but added that it was "not [a] substantially significant difference." He also noted that Hernandez, at 63.7 inches and 208 pounds, was obese and had hypertension. He said that Hernandez was able to sit and stand but was "not able to move around much [due to] asthma."

In early November 2001 a state agency physician reviewed Hernandez's records and assessed her functional capacity. He concluded that her asthma and hypertension did not prevent her from working.

From November 2001 to February 2002, Hernandez received treatment for her asthma at the Crusader Clinic in Rockford, Illinois and in conjunction received a "pulmonary function interpretation" from a specialist at SwedishAmerican Hospital. The specialist at the hospital diagnosed her with mild COPD. Throughout this period the doctors at the clinic found Hernandez's lungs to have a minimal amount of wheezing and her asthma not to be exacerbated. In February 2002 she weighed 220 pounds.

From September 2002 through January 2003, Hernandez was treated by Dr. John Paulson at the Rice Medical Center in Stevens Point, Wisconsin. She began seeing Dr. Paulson immediately after being discharged from a three-day hospital stay for an "acute exacerbation of her chronic obstructive lung disease." (No other information about her hospital stay is in the record.) Dr. Paulson diagnosed her with "stable" COPD and obesity. He found her lungs clear, without rales, rhonchi or wheezes. Upon Dr. Paulson's recommendation, (id.), Hernandez participated in 19 sessions of pulmonary rehabilitation at that clinic from October 2002 through December 2002. The progress notes from those sessions reflect that Hernandez reported less shortness of breath at the completion of the program and had established a home exercise routine of riding a stationary bicycle for 30 minutes daily. At her second meeting with Dr. Paulson in November 2002, he noted that her COPD was "significantly improved," that her lungs were "clear," and that "her breathing has been doing much better." He did, though, note that at 222 pounds, she had

gained weight. The third time that Dr. Paulson saw Hernandez, in December 2002, she had been sent there by the pulmonary rehabilitation technicians because she had been wheezing increasingly. Dr. Paulson diagnosed her with bronchitis, which, he found, had exacerbated her COPD. He did, however, find her lungs clear of rales or rhonchi, and he prescribed her an antibiotic. At their final meeting in January 2003, Dr. Paulson found her lungs "clear" and noted that Hernandez reported that she "had more pep and energy" and, at 218 pounds, had lost some weight.

Also in January 2003, Hernandez testified briefly at a hearing before the ALJ. She testified that she was 5'6" and 218 pounds and that she suffered from asthma, COPD, and hypertension. She said that due to these conditions, and her weight, she could stand for only 15-20 minutes before becoming out of breath. The ALJ issued an opinion denying Hernandez's application for disability benefits the next month. The ALJ assessed a residual functional capacity ("RFC") for Hernandez that included, among other things, the ability to stand six hours in an eight-hour workday. Based on that RFC, the ALJ found that Hernandez was not disabled because she could still perform her past work as a plastics packager.

Hernandez requested that the Appeals Council review the ALJ's decision. She accompanied her request with a Pulmonary Residual Functional Capacity Questionnaire that Dr. Paulson filled out in April 2003 (four months after he last treated Hernandez and two months after the ALJ issued its decision). Dr. Paulson opined that Hernandez could sit about two hours in a workday and stand or walk less than two hours in a workday. He said that Hernandez could occasionally lift and carry no more than ten pounds, and that she should avoid all exposure to heat, fumes, odors, dusts, and gases. Dr. Paulson further opined that based on the results of Hernandez's Incremental Shuttle Walk Tests ("ISWT"), which she had completed upon entry and exit into pulmonary rehabilitation, Hernandez could walk only 230 meters before needing to rest. He attached the ISWT results to the questionnaire. In sum he opined that Hernandez could work only two-to-three days per week and two-to-three hours per day. In August 2004 the Appeals Council remanded the case, ordering the ALJ to (1) consider Dr. Paulson's new opinion, (2) consider in greater depth Dr. Netzel's 2001 opinion that Hernandez could "not move around much due to asthma," and (3) consider in greater depth Hernandez's RFC, noting that the ALJ had not undertaken a function-by-function assessment of Hernandez's ability to do work-related activities nor addressed the effects of Hernandez's obesity on her functioning.

Meanwhile, after a tenth-month gap in treatment, Hernandez was treated by

Dr. Michael Schneeberger from November 2003 through July 2004 at the Rice Medical Clinic. At their initial meeting in November, Dr. Schneeberger recorded that Hernandez suffered from asthma, COPD, and obesity. He noted that Hernandez complained of chronic shortness of breath, but he found her lungs clear with no wheezes. While in Dr. Schneeberger's care, in December 2003, Hernandez underwent pulmonary testing at a nearby hospital. The tests revealed a "mild obstructive lung defect" and a "normal diffusion capacity." In January 2004 Hernadez saw Dr. Schneeberger again, complaining of a cold. He diagnosed her with an upper respiratory infection. He found her asthma "well-controlled" at the time and her lungs clear of wheezing, rales, and rhonchi. At a six-month follow-up in July 2004, Dr. Schneeberger detected a "few fine wheezes" in Hernandez's lungs, and again recorded that she was obese and that her COPD and asthma were "reasonably well controlled." Hernandez saw Dr. Schneeberger a final time at the end of July. Dr. Schneeberger refused to grant her request at that time for a letter deeming her incapable of working; he explained to her that her pulmonary function studies dating back to December 2003 showed only "mild obstructive defect" and "normal diffusion capacity." He found her lungs clear, deemed her asthma "mild to moderate," and noted that she was obese but in "no distress."

In April 2005, after a nine-month gap in treatment, Hernandez saw one final physician, Dr. David Johnson, this time at the Monroe Clinic where she had originally seen Dr. Netzel. Her lungs revealed "expiratory wheezing." In May she reported to Dr. Johnson with shortness of breath, and so Dr. Johnson conducted more pulmonary function tests. In Dr. Johnson's opinion, her lung function was "fairly consistent with what it was the last time it was checked by Dr. Netzel back in 2001"; he found the obstruction "mild."

Finally, in August 2005 Hernandez testified at a second hearing before the ALJ. This time she was represented by counsel. Hernandez testified that she is unable to work due to shortness of breath. She testified that she can stand for only ten minutes at a time without having to sit down.

Vocational Expert ("VE") Michele Albers also testified at the hearing. The ALJ asked her whether a person who could lift ten pounds frequently, twenty pounds occasionally, sit for six out of eight hours, and stand for two out of eight hours could perform any of Hernadez's past work. The VE testified that such a person could perform Hernadez's previous job of produce sorter "as [Hernandez] described it in the exhibits," namely as being able to "sit and stand" while sorting. The VE was presumably referring to the Work History Report that Hernandez completed prior to the hearing because there Hernandez reported that as a produce sorter she "stood or sat by a table" and tossed out bad produce. Upon cross examination by Hernandez's attorney, the VE admitted that the Dictionary of Occupational Titles ("DOT") classifies produce sorting as light work that requires between six and eight hours of standing in a workday. But the VE explained that her testimony was

that the hypothetical person could perform Hernandez's past work as a produce sorter, as Hernadez had actually performed the job, reiterating that she was "going off the information that I saw in the file that the person was able to sit and stand."

In his second written opinion, the ALJ followed the five-step test for evaluating disability, 20 C.F.R. § 404.1520. The ALJ found Hernandez's obesity not to be a severe impairment because it was not of "such a significant degree," and because the record contained no evidence of any resulting limitations. Then, because the ALJ determined that Hernadez's impairments that were severe—her asthma, COPD, and hypertension—did not meet a listed impairment under 20 C.F.R. § 404, the ALJ formulated Hernandez's RFC for use at steps four and five. In doing so, the ALJ refused to credit Dr. Netzel's opinion that Hernandez "could not move around much due to asthma" because, said the ALJ, it was vague and not grounded in medical evidence. The ALJ also refused to credit Dr. Paulson's opinion for several reasons, among them that (1) the pulmonary function studies that Dr. Paulson purported to rely upon showed only mild lung disease and a normal diffusion capacity, (2) Dr. Paulson's opinion conflicted with Dr. Schneeberger's who had refused to deem Hernandez disabled, and (3) the later pulmonary function studies performed by Dr. Scneeberger showed Hernandez's lungs to be clear, her COPD to be mild, and her asthma to be well controlled. The ALJ ultimately concluded that Hernandez retained the RFC to sit for up to six hours and stand for up to two hours in an eight-hour workday and to lift no more than ten pounds with frequency. Then, at step four, the ALJ found Hernandez not disabled because according to the VE's testimony Hernandez could still perform her past work as a produce sorter with that RFC.

The Appeals Council refused Hernandez's second request for review, making the ALJ's ruling the Commissioner's final decision. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Hernandez appealed to the district court for judicial review, and the district court accepted a magistrate judge's recommendation to affirm.

We will uphold an ALJ's denial of disability benefits so long as the decision is supported by substantial evidence and is not based on an error of law. 42 U.S.C. § 405(g); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence exists if a reasonable person could conclude that there is enough evidence to support the decision. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

We begin by addressing Hernandez's arguments that the ALJ's RFC findings were not supported by substantial evidence. In this vein, Hernandez first argues that the ALJ erred by not affording controlling weight to Dr. Paulson's opinion that she could stand for less than two hours and sit for only two hours in an eight-hour workday. Hernandez contends that Dr. Paulson's opinion was entitled to such weight because he was her

"treating physician." She also points out that the ALJ failed to explicitly discuss one of the bases of Dr. Paulson's opinion—the results of her ISWTs.

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). This rule takes into account the treating physician's advantage in having personally examined the claimant and developed a rapport, *see Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006), while controlling for the biases that a treating physician may develop, such as friendship with the patient, *see Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

Here the ALJ was not required to give Dr. Paulson's opinion controlling weight because his opinion was contradicted by other substantial evidence in the record. First, as the ALJ explained, Dr. Paulson's opinion is directly contradicted by the more recent opinion of another of Hernandez's own treating physicians, Dr. Schneeberger. After treating Hernandez for eight months, Dr. Schneeberger refused to deem her incapable of working because her pulmonary function studies throughout that period showed only "mild obstructive defect" and "normal diffusion capacity." The ALJ was entitled to credit one treating physician's opinion over that of another. *See Hofslien*, 439 F.3d at 377; *Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004). *See generally Haynes*, 416 F.3d at 626 (explaining that reviewing court may not reweigh evidence or substitute its own judgment for that of ALJ).[1] The ALJ further explained that he reviewed both the pulmonary function reports that Dr. Schneeberger referred to and the earlier reports dating back to 2001 (including those prepared by Dr. Paulson himself when Hernandez was his patient). Our own review of these reports strongly supports the ALJ's assessment that Hernandez's

---

[1]Hernandez asserts that the ALJ should have credited Dr. Paulson over Dr. Schneeberger because Dr. Paulson treated Hernandez 19 times and is a pulmonary specialist whereas Dr. Schneeberger is an internist. Neither is true. Hernandez attended 19 sessions of pulmonary rehabilitation, but saw Dr. Paulson only four times over four months. And Hernandez does not offer any evidence of Dr. Paulson's credentials. At the 2005 hearing her attorney asked her whether Dr. Paulson was a pulmonary specialist and Hernandez replied, "I think he was internal medicine, I believe." According to Rice Medical Center's own website and WebMD, Dr. Paulson is a general internist. *See* http://www.ministryhealth.org/display/PPF/DocID/14312/router.aspx (last visited April 28, 2008); http://doctor.webmd.com/physician_finder/profile.aspx?sponsor=core&pid=3360e43b-488a-4426-8652-caf8bcf72b10 (last visited April 28, 2008).

asthma and COPD were simply not so severe as to produce the limitations described by Dr. Paulson in the questionnaire that he completed four months after last treating Hernandez. Aside from the infrequent note of an occasional wheeze, the reports consistently find Hernandez's lungs to be clear and her diffusion capacity to be normal and thus characterize her asthma and COPD as mild and well controlled. Where the objective medical evidence in the record contradicts a treating physician's opinion, we will uphold the ALJ's decision not to give that opinion controlling weight. *See Skarbek,* 390 F.3d at 503-04.

Hernandez's point that the ISWT results were not discussed fares no better. The general rule is that although an ALJ must confront the evidence in the record that does not support his conclusion, *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004), he "need not provide a written evaluation of every piece of evidence and testimony." *Rice,* 384 F.3d at 371. Here it is not even the case that the ISWT results contradicted the ALJ's conclusion: Dr. Paulson cited to them only when he answered the question: "How many city blocks can your patient walk without rest?" Dr. Paulson did not similarly cite to the test results as support for his assessment of how long Hernandez could sit and stand within a workday—the critical assessment here. And Hernandez has failed to articulate convincingly how the test results are relevant to that assessment. She appears to contend that the ISWT results demonstrate generally the severity of her asthma and COPD because, in her opinion, they show that her condition was unresponsive to pulmonary rehabilitation. But the results indicate just the opposite: after 19 sessions Hernandez was able to walk nearly twice as many shuttles, 23 as opposed to 12, as she had when she started the program.

Hernandez next argues that the ALJ erred in formulating her RFC by not considering her obesity in combination with her other impairments. Hernandez correctly points out that Social Security Ruling 02-1p requires an ALJ to consider the exacerbating effects of a claimant's obesity on her underlying conditions (even if the obesity is not itself a severe impairment) when arriving at a claimant's RFC. *See* SSR 02-1p; *Prochaska v. Barnhart,* 454 F.3d 731, 736-37 (7th Cir. 2006); *Clifford v. Apfel,* 227 F.3d 863, 873 (7th Cir. 2000). Hernandez contends that the ALJ considered her obesity in isolation, if at all.

Here the ALJ did not explicitly discuss the exacerbating effects of Hernandez's obesity on her other limitations when arriving at her RFC, but the error was harmless. *See generally Keys v. Barnhart,* 347 F.3d 990, 994 (7th Cir. 2003) ("the doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"). Hernandez did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning—as it was her burden to do. *See Prochaska*, 454 F.3d at 736-37; *Skarbek,* 390 F.3d at 504. Where the claimant herself is silent in this regard, we have repeatedly excused as harmless error the failure of an ALJ to explicitly address the claimant's obesity as SSR 02-

1p prescribes so long as the ALJ demonstrated that he reviewed the medical reports of the doctors familiar with the claimant's obesity. *See Prochaska*, 454 F.3d at 736-37; *Skarbek,* 390 F.3d at 504. Here the medical records discussed by the ALJ make repeated reference to Hernandez's obesity. And the ALJ was correct that they contain "no reference . . . to any specific limitations caused by obesity."[2]

Having resolved Hernandez's arguments about her RFC, we turn to her argument that the VE's testimony does not constitute substantial evidence for the ALJ's finding that she was still capable of performing her past work as a produce sorter. In Hernandez's view, the VE's testimony that she could work as a produce sorter while limited to two hours of standing in a workday conflicted with the DOT, which classifies produce sorting as requiring at least six hours of standing in a workday. Hernandez contends that this obvious conflict triggered the ALJ's duty under Social Security Ruling 00-4p to obtain a reasonable explanation for the inconsistencies between the VE's testimony and the DOT. *See* SSR 00-4p; *Prochaska*, 454 F.3d at 735. This, says Hernandez, the ALJ did not do.

The Commissioner does not dispute that an ALJ bears the affirmative duty to elicit such an explanation from a VE when a conflict with the DOT is apparent. Instead, relying primarily on *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003), the Commissioner argues that the DOT and SSR 00-4p never came into play here because the VE found that Hernandez could still perform her work as a produce sorter *as she had actually performed the job in the past,* not as it is generally performed.

The Commissioner's understanding is correct. At step four an ALJ may find a claimant not disabled if she can perform her past work either as it is generally performed in the national economy or as she actually performed it. *See* 20 C.F.R. § 404.1560(b)(2); SSR 82-

---

[2]Hernandez also makes several frivolous arguments that the ALJ erred by finding her obesity not to be a severe impairment (at step two). She says that SSR 02-1p required the ALJ to recontact her physicians for clarification before he rejected their diagnoses. *See* SSR 02-1p 67 ("[I]f the evidence indicates that the diagnosis [of obesity] is questionable . . . we will contact the source for clarification."). The problem with this argument is that the ALJ did *not* reject Hernandez's treating physicians's diagnoses of obesity; the ALJ merely found that there was no evidence demonstrating that Hernandez's obesity was a severe impairment. Hernandez also appears to assert that, because her obesity was diagnosed by her treating physicians, the ALJ was thereby required to find that it was a severe impairment. But SSR 02-1p provides that obesity is a severe impairment only when it results in significant limitations on a claimant's ability to do work-related activities. *See* SSR 02-1p.

61. When a VE testifies that a claimant can still perform her past work as it was actually performed, the DOT becomes irrelevant. *See Jens,* 347 F.3d at 213.

Anticipating the Commissioner's argument, Hernandez insists that it is unclear whether the VE testified that she was capable of being a produce sorter as she actually had in the past. But a straightforward reading of the hearing transcript confirms that the VE testified to exactly that. The VE twice unambiguously explained that her testimony on this issue was based on Hernandez's statement that she was permitted to sit or stand while sorting. The VE even added on cross examination that she was not relying on the DOT. Hernandez also says that the ALJ was required to state explicitly in his opinion which of the two (as actually performed or as generally performed) he was finding Hernandez capable of. But it is perfectly clear from the ALJ's explicit reliance on the VE's unambiguous testimony that the ALJ found Hernandez not disabled because she could still work as a produce sorter as she had actually performed the job in the past. *See generally Rice,* 384 F.3d at 369 (explaining that this court will "give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it").

For the foregoing reasons, we affirm the denial of Social Security benefits.